## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **MI MANAGEMENT, LLC, and MARK IUPPENLATZ,**<br><br>**Plaintiffs**<br>**v.**<br><br>**GERALD NUDO, NW LOAN, LLC, and MARC REALTY, LLC,**<br><br>**Defendants**. | Case No. _____. |

## COMPLAINT

Plaintiffs MI Management, LLC and Mark Iuppenlatz for their Complaint against Defendants Gerald Nudo, NW Loan, LLC, and Marc Realty, LLC state as follows:

1. From in or about 2013 to the present, Defendants Gerald Nudo ("Nudo") as a manager, owner and alter ego of NW Loan, LLC ("NW") and of NW's successor Voshel Investments, LLC ("Voshel"), together with defendant Marc Realty, LLC ("Marc Realty") jointly acted with the longtime business partner of Nudo, Todd Bryant ("Bryant"), to deny Plaintiffs Mark Iuppenlatz and MI Management, LLC (together "Plaintiffs") valuable financial rights and interests including: (a) assets of Proteus Group via the misconduct of Bryant ("Bryant Misconduct") and of Defendants; and (b) the ability to obtain recovery against Bryant for his misconduct against Plaintiffs in relation to the operation of Proteus Group and Proteus Holdings.

2. Nudo and the other defendants accomplished the foregoing by, *inter alia*: (a) engaging in and conspiring in a scheme to defraud in relation to the Bryant Misconduct and other subsequent misconduct of Bryant and Nudo; and (b) aiding and abetting Bryant's breach of

fiduciary duties he owed and owes to Plaintiffs including by advancing and concealing Bryant's breach of fiduciary duties.

3.     Nudo and entities under the control of Nudo (including Marc Realty, NW, and Voshel) combined and conspired with and aided and abetted Bryant to deny Plaintiffs millions of dollars in valuable financial rights and interests by assisting Bryant to avoid and attempt to avoid his obligations and liability to Plaintiffs for the Bryant Misconduct and other subsequent misconduct of Bryant and Nudo and the other defendants including through knowingly and recklessly engaging in misrepresentations, material omissions, deception, and concealment to surreptitiously manipulate and transfer control over the assets of Proteus Group so as to defeat Plaintiffs' claims against Bryant and to deny Plaintiffs the ability to execute against those assets and against Bryant.

4.     From 2013 through the present, Nudo's long-term course of deception, fraud, and aiding and abetting of Bryant's breaches of fiduciary duty include and feature:

(a) in 2015, causing and undertaking the improper, concealed purchase of the Proteus Group assets that had been posted as collateral for a loan from Inland Bank ("Proteus assets") in derogation of the rights of and fiduciary duties owed to Plaintiffs in a manner designed improperly to provide Bryant personally along with Nudo/NW/Voshel control over the Proteus assets so as to damage Proteus Holdings, Proteus Group, and Plaintiffs;

(b) as part of the above 2015 transaction, knowingly and intentionally causing the Proteus assets improperly and covertly to be used as collateral for a loan from Nudo/NW/Voshel to allow a Bryant-controlled entity named PHDS Acquisitions, LLC to purchase the loan from Inland Bank;

(c) from 2015 through at least 2019, knowingly and intentionally causing the Proteus assets to remain permanently encumbered by combining and conspiring with Bryant to engage in self-dealing and breaches of fiduciary duties to use that Proteus assets collateral as a basis for additional loans for Bryant and his businesses and by permitting Bryant to forego obligations that would have freed the collateral from encumbrance;

(d) in November 2016, secretly transferring all Proteus assets to Ingenious Architecture, LLC ("Ingenious") without disclosure to or approval by Plaintiffs, so as to leave Proteus Group as an insolvent shell;

(e) in 2016-17 and 2019, conducting and attempting to conduct three sham UCC sales of Proteus assets: (i) first in November 2016-January 2017, attempting a UCC sale of Proteus assets without notifying Plaintiffs (which sale would have been a sham given the prior secret transfer of the Proteus assets to Ingenious) and, when Plaintiffs learned of the sale through other means at the last moment, engaging in a course of misrepresentation and/or omission of material facts to Plaintiffs; (ii) a second sham UCC sale of non-existent Proteus assets on July 19, 2019; (iii) a third sham UCC sale of non-existent Proteus assets on September 9, 2019, this time falsely representing without legal basis that the sale included Plaintiffs' derivative claims in this arbitration; and

(f) from 2021 to the present, Voshel's intervention in a long-pending arbitration that MI Management and Iuppenlatz have brought against Bryant and others (nearly two years after the faux 2019 UCC sales) designed to obstruct and defeat Plaintiffs' effort

to pursue Proteus assets that Bryant diverted from Proteus, that Bryant and Nudo diverted to Ingenious and to other non-Proteus recipients from 2013 and thereafter.

5.     The Bryant Misconduct includes the actions articulated in the Second Amended Demand for Injunction, Declaratory Judgment, Damages, and Other Relief ("Second Arbitration Demand" or "SADA") for which Bryant has been held liable in the above-referenced arbitration (the "Arbitration"). A true and correct copy of the SADA (without exhibits) is attached as **Exhibit A**. Through Nudo, Voshel formally has adopted all of the allegations articulated in the Second Arbitration Demand through Voshel's "Substituted Demand For Injunction, Declaratory Judgment, Damages And Other Relief" ("Intervention Demand"). A true and correct copy of the Intervention Demand is attached hereto as **Exhibit B**.

6.     Plaintiffs incorporate by reference the allegations of the Second Arbitration Demand establishing the Bryant Misconduct, which Voshel – through Nudo – has formally adopted through its Intervention Demand. These allegations include Second Arbitration Demand ¶¶ 1, 2:

   a. Talbert and Bryant have diverted more than $5,000,000 of Proteus Group's assets to themselves and/or entities they control in violation of the Operating Agreements of both Proteus Group and its majority unit holder, Proteus Holdings.

   b. Despite Plaintiffs' numerous attempts to try and stop the improper transfers, Bryant and Talbert defiantly continue to improperly divert Proteus Group's assets to themselves and have gone so far as to cause it to forgive millions of dollars in so-called "loans" made by Proteus Group to Talbert, Bryant, and entities they control.

## PARTIES, CO-CONSPIRATORS, AND RELEVANT NON-PARTIES

7.      Plaintiff MI Management is a limited liability company duly organized and existing under the laws of the State of North Carolina, with its principal place of business in Colorado. MI Management is a member of Proteus Holdings.

8.      Plaintiff Mark Iuppenlatz, who resides in and is a citizen of Colorado, is the sole member and manager of MI Management. Iuppenlatz is also a manager of Proteus Holdings.

9.      Non-party Proteus Holdings, LLC is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.

10.     Non-party Proteus Group, LLC is a limited liability company duly organized and under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

11.     Defendant Gerald Nudo manages and fully controls NW and its successor Voshel. Nudo resides in and is a citizen of Illinois. Since in or about 2013, Nudo has been a close business associate of Bryant's, participating with him in a substantial number of different business endeavors in various places in the U.S. including several lucrative ongoing enterprises.

12.     Defendant NW Loan, LLC is a limited liability company duly organized and under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. Upon information and belief, none of its direct or indirect members are citizens of Colorado.

13.     Non-party Voshel Investments, LLC is a limited liability company duly organized and under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. Upon information and belief, Nudo and his wife, Ann Voshel, indirectly own a majority of Voshel. After Voshel submitted itself to the jurisdiction of the Arbitrator and was granted leave to intervene in the Arbitration, Plaintiffs filed a Counterclaim against Voshel in the Arbitration arising out of the same misconduct alleged in this Complaint.

14. Defendant Marc Realty, LLC is a limited liability company duly organized and under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. Upon information and belief, none of its direct or indirect members are citizens of Colorado.

15. Non-party Todd Bryant resides in Illinois. Bryant is a manager of Proteus Holdings and Proteus Group and a member of Proteus Holdings.

16. Non-party Frank Talbert resides in Illinois. Talbert is a manager and member of Proteus Holdings and Proteus Group.

## JURISDICTION

17. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states. Plaintiffs are citizens of Colorado. Upon information and belief, no defendant is a citizen of Colorado. Moreover, the amount in controversy in this case is in the many millions, far exceeding the $75,000 threshold.

18. This Court has personal jurisdiction over the Defendants because all the Defendants are Illinois residents (Nudo) or incorporated in Illinois (NW and Marc Realty), the claims alleged herein arise from their business transactions in Illinois, and their commission of tortious acts in Illinois, including without limitation aiding and abetting and conspiring to commit breaches of fiduciary duty in Illinois.

19. Venue is proper in this District because: (i) all the Defendants reside in this District; and (ii) a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

20.     On or about April 2010, Plaintiffs initiated litigation against Bryant and Frank Talbert ("Talbert") for breaches of contract and breaches of fiduciary duties by Bryant and Talbert in relation to the operations of Proteus. Among other things, Plaintiffs alleged that Bryant engaged in extensive self-dealing and improperly diverted millions of dollars in assets from Proteus to his own benefit at the expense of Proteus and Plaintiffs.

21.     On or about 2012, an arbitral tribunal found in favor of Plaintiffs. The case then went before the Circuit Court of Cook County for confirmation.

22.     In early 2015, Circuit Court of Cook County Judge Novak sent the case back for a second arbitration, which Plaintiffs initiated via the Second Arbitration Demand on December 23, 2014 and is continuing.

23.     The allegations of the Second Arbitration Demand that Voshel has formally adopted via Nudo through its Intervention Demand include:

a.   Talbert and Bryant formed Proteus Group in 2001. Proteus Group provides specialized architectural and engineering services to business involved in the medical and health care industry.

b.   In October 2001, members of Proteus Group, including Bryant and Talbert, executed an operating agreement …which established operating procedures for Proteus Group.

c.   [In 2008,] Bryant and Talbert approached Iuppenlatz about the opportunity to invest in Proteus Group.

d.   Iuppenlatz then formed MI Management to serve as his investment vehicle.

e.   To facilitate the investment [in Proteus Group], Bryant, Talbert, and Iuppenlatz created Proteus Holdings.

f.   Bryant transferred his entire interest in Proteus Group to Proteus Holdings. Talbert transferred all but 1% of his interest in Proteus Group to Proteus Holdings [causing]

Proteus Holdings [to] own 77% of the membership shares of Proteus Group.

g. Iuppenlatz then formed MI Management to serve as his investment vehicle.

h. MI Management's loan ["MI Note"] to Proteus Holdings in the amount of $1,250,000.00 [was] in exchange for MI Management obtaining an interest in Proteus Holdings.

i. The ownership structure of Proteus Holdings is as follows:

| Member | Ownership Interest |
|--------|--------------------|
| MI | 33.62% |
| Bryant | 33.62% |
| Talbert | 32.76% |

j. On December 31, 2008, MI Management, Bryant, and Talbert executed an operating agreement for Proteus Holdings Operating Agreement (the "Proteus Holdings Operating Agreement") which established the operating procedures for Proteus Holdings and explicitly limited Bryant and Talbert's ability to operate Proteus Group without MI Management's involvement and consent.

k. Bryant, Talbert, and Iuppenlatz specifically designed the Proteus Holdings Operating Agreement to prevent Bryant and Talbert from transferring the assets of Proteus Group to Bryant, Talbert, Iuppenlatz, or any Bryant and Talbert Entities without unanimous consent of Bryant, Talbert, and Iuppenlatz

l. Section 7.2(e) of the Proteus Holdings Operating Agreement enumerates a series of corporate actions that can only be undertaken [upon] ***unanimous consent*** of all three Managers. These include:

(1) Selling or otherwise disposing of or causing … Proteus Group to sell or dispose of or authorize the sale or disposal of any assets outside the ordinary course of business;

(2) Entering into or permitting to exist any transaction …between Proteus Group and any

Manager or any Affiliate of any manager except for those expressly set forth in the Proteus Holdings Operating Agreement;

(3) Incurring any indebtedness for Proteus Group or any Affiliate [except with regard to reaffirmation or extension of any indebtedness in favor of Inland Bank and in effect at the time of the Proteus Holdings Operating Agreement];

(4) Making, taking and exercising all decisions, actions, and powers that Proteus Holdings as owner of 77% of the membership interests of Proteus Group is authorized to make under the operating agreement of Proteus Group; and

(5) Allowing or causing Proteus Group to enter into any action outside the ordinary course of business.

m. The decisions, actions, and powers that Proteus Holdings as owner of 77% of the membership interests of Proteus Group is authorized to make under the operating agreement of Proteus Group include:

(1) Refinancing;

(2) Making distributions to members;

(3) Entering into any contract that could adversely affect the financial condition of Proteus Group.

**Fiduciary Duties of Bryant**

24.    Throughout the relevant time period, as a manager of Proteus Holdings and Proteus Group, Bryant owed and continues to owe fiduciary duties to MI Management, Iuppenlatz, and Proteus, including without limitation fiduciary obligations of trust, loyalty, good faith, and due care, and was and is required to use his utmost ability to control and manage Proteus in a fair, just, honest, and equitable manner. Bryant was and is required to act in furtherance of the best interests of Proteus and not in furtherance of his personal interests or

benefit to the detriment of Proteus, MI Management, and Iuppenlatz.

25.     By virtue of his status a manager of Proteus, Bryant owed and continues to owe fiduciary duties and the obligations of good faith and fair dealing to Proteus Holdings and Proteus Group.

26.     As the majority and controlling members of Proteus Holdings, Bryant and Talbert also owed and continue to owe fiduciary duties and the obligation of good faith and fair dealing to the minority shareholder, MI Management.

27.     By virtue of his ability to control the operations and decisions of Proteus and Bryant possessed superiority over MI Management and Iuppenlatz with respect to the management, operations, and financial affairs of Proteus.

28.     Bryant maintained and continued to maintain superiority over MI Management and Iuppenlatz because, unlike MI Management and Iuppenlatz, Bryant and Talbert had access to and control of the books and records and controlled sales, operational, and financial operations of Proteus. Accordingly, Bryant controlled the myriad transactions at issue in this case and had actual domination and control over Proteus in connection with these transactions.

29.     Bryant and Talbert were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Proteus Holdings and Proteus Group. By virtue of such duties, Bryant and Talbert were required to avoid engaging in, approving, or permitting self-dealing at the expense of the Proteus and Plaintiffs.

30.     Bryant and Talbert had and have the duty to undertake all actions under the operating agreements of and with respect to Proteus Holdings and Proteus Group consistent with their fiduciary duties to maintain trust, loyalty, good faith, and due care, and to act toward Proteus in a fair, just, honest, and equitable manner. This forbids self-dealing. This also forbids Bryant and Talbert from taking action in violation of the provisions of the operating agreements

including (a) causing improper financings, (b) unauthorized distributions to or for the benefit of managers, (c) entering into contracts that could adversely affect the financial condition of the Proteus Group, and (d) undertaking any of the following without the consent of Iuppenlatz: allowing or causing Proteus Group to enter into any action outside the ordinary course of business including specifically selling or disposing of the assets of Proteus Group outside the ordinary course of business; entering into transactions between Proteus Group and Bryant or any affiliate of Bryant; making decisions at Proteus Group involving refinancings or incurring any indebtedness for Proteus Group; and distributions to or for the benefit of Bryant or Talbert.

31.     The allegations of the Second Arbitration Demand that Voshel has formally adopted (with Nudo's approval) through its Intervention Demand includes the following allegations regarding Bryant's fiduciary duties to Plaintiffs and Proteus:

1.  As Managers of Proteus Group, Bryant and Talbert had a fiduciary duty to Proteus Group and Proteus Holdings [and by extension to Plaintiffs] to refrain from self-dealing and a duty to account to Proteus Group its rightful assets;

2.  As Members and Managers of Proteus Holdings, Bryant and Talbert had a duty to MI Management to refrain from self-dealing and a duty to account to Proteus Holdings for its rightful assets.

**Breaches of Fiduciary Duties by Bryant and Talbert**

32.     The allegations of the Second Arbitration Demand that Voshel has formally adopted via Nudo through its Intervention Demand includes the following allegations, which includes breaches that are alleged to be continuing ("Continued Breaches"):

a.  In addition to the diversion of more than $5,000,000 of Proteus Group's assets to Bryant and entities he controls in violation of the Operating Agreements of both

11

Proteus Group and Proteus Holdings, Bryant continued to cause Proteus Group assets to be diverted to independent third-party entities as well as third party entities owned or controlled by Bryant.

b. Neither Bryant nor Talbert ever solicited the consent of MI Management or Iuppenlatz prior to transferring Proteus Group funds to Bryant and entities owned and/or controlled by Bryant notwithstanding the unequivocal terms of the Proteus Holdings and Proteus Group Operating Agreements.

c. By making improper and unauthorized distributions or "loans" from Proteus Group to non-Proteus entities and to themselves and by making improper and unauthorized payments for non-Proteus expenses that were for purposes other than the furtherance of Proteus Group's business, Bryant and Talbert breached and continue to breach their fiduciary duties to Proteus Group and Proteus Holdings [and by extension to Plaintiffs];

d. Bryant and Talbert breached their fiduciary duties by obligating Proteus Group on various loan guarantees and notes without Iuppenlatz's consent;

e. By making improper and unauthorized payments or "loans" from Proteus Group to non-Proteus entities and to themselves and by making improper and unauthorized payments for non-Proteus expenses that were for purposes other than the furtherance of Proteus Group's business, Bryant and Talbert breached and continue to breach their fiduciary duties to MI Management;

f. Bryant and Talbert breached their fiduciary duties to MI Management and Iuppenlatz by subsequently forgiving all said "loans" they made on behalf of Proteus Group and depleting Proteus Group of over 80% of its assets.

g. Bryant and Talbert breached their fiduciary duty to MI Management and

Iuppenlatz by obstructing Iuppenlatz's ability to inspect the books and records of Proteus Group and Proteus Holdings and by failing to provide sufficient evidence to demonstrate that payments made by Proteus Group were for the business of Proteus Group or for a legitimate purpose.

h. Since 2009, Bryant and Talbert have used and continue to use Proteus Group's assets to pay expenses for non-Proteus Group entities, as well as to pay for their own personal expenses unrelated to the business of Proteus Group, including the [continued breaches].

i. MI Management is entitled to recover from Bryant and Talbert any monies they received as from Proteus Group as a result of their breach of their fiduciary duties to MI Management.

33. Bryant and Talbert engaged in intentional and reckless violations of their obligations as managers of Proteus and majority members of Proteus Holdings, acted in bad faith, and an intentionally and recklessly disregarded for their duties to Proteus, MI Management, and Iuppenlatz, which Bryant and Talbert were aware of or recklessly permitted that caused and posed a risk of serious injury to the Proteus, MI Management, and Iuppenlatz.

34. Bryant and Talbert breached their duties of loyalty and good faith by engaging in, or allowing each other to engage in, self-dealing at the expense of Proteus, MI Management, and Iuppenlatz.

35. Because of their position of control and authority as managers of Proteus and majority members of Proteus Holdings, Bryant and Talbert directly and/or indirectly exercised control over the wrongful acts complained of herein.

**Conspiracy, Aiding and Abetting, and Concerted Action of Nudo, NW Loan, and Marc Realty**

36.     Beginning in or about 2013, Nudo, NW, and Voshel, with the knowledge, assistance, and participation of Marc Realty, conspired and aided and abetted Bryant in relation to the Bryant Misconduct and in relation to continuing misconduct to deny Plaintiffs valuable financial rights and interests including: (a) assets of Proteus Group via Continued Breaches of Bryant's fiduciary duties under the Proteus Operating Agreements; and (b) the ability to obtain recovery against Bryant for his misconduct. Nudo/NW/Voshel accomplished the foregoing by: (a) employing misrepresentations, material omissions, and deceptive actions to engage in and conspire regarding a scheme to defraud in relation to the Bryant Misconduct and the Continued Breaches; and (b) aiding and abetting Bryant's breach of fiduciary duties he owed and owes to Plaintiffs.

37.     In committing the wrongful acts alleged herein, Bryant, Nudo, NW, , with the knowledge, assistance, and participation of Marc Realty, directly and/or indirectly through the entities they control, have pursued, or joined in the pursuit of a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.

38.     Nudo, NW, and Voshel, with the knowledge, assistance, and participation of Marc Realty, directly and/or indirectly through entities they control aided and abetted and/or assisted Bryant and Talbert in breaching their fiduciary duties, committing fraud against Plaintiffs, and in breaching their contractual obligations.

39.     Nudo, NW, and Voshel, , with the knowledge, assistance, and participation of Marc Realty, directly and/or indirectly through entities they control each aided and abetted, encouraged, facilitated, and rendered substantial assistance in the wrongs in which Bryant and Talbert engaged complained of herein.

40.     In taking such actions to substantially assist the commission of the wrongdoing

complained of herein, Nudo, NW, and Voshel, , with the knowledge, assistance, and participation of Marc Realty, each acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and were aware of their overall contribution to and furtherance of the wrongdoing.

41.     During all times relevant hereto, Bryant, Talbert, Nudo, NW, and Voshel, , with the knowledge, assistance, and participation of Marc Realty, directly and/or indirectly through entities they control, collectively and individually, initiated a course of conduct that was designed to and did facilitate their insider, self-dealing, and conflict of interest transactions.

42.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise and conceal Bryant's violations of law, fraud, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment so as to facilitate Bryant's misconduct including to avoid financial responsibility for the misconduct.

43.     Bryant, Talbert, Nudo, NW, and Voshel, , with the knowledge, assistance, and participation of Marc Realty, directly and/or indirectly through entities they control, accomplished their conspiracy, common enterprise, and/or common course of conduct, *inter alia*, by acquiescing to each other's self-dealing and consenting to transactions that were beneficial to themselves, entities they control, but detrimental to Proteus, MI Management, and Iuppenlatz.

44.     The misconduct and tortious conduct of Bryant, Talbert, Nudo, NW, committed with the knowledge, assistance, and participation of Marc Realty, directly and/or indirectly through entities they control, caused continuing and repeated injuries to Plaintiffs by continuously engaged in the various acts of tortious acts to advance the scheme alleged herein to: (i) subvert Plaintiffs' contractual rights under the Proteus Holding operating agreement; and (ii) obstruct, hinder, and undermine Plaintiffs' ability to recover Proteus assets, including Proteus assets that Bryant diverted for his own direct and indirect benefit. These tortious acts and

resulting injuries have continued to the present, including without limitation through Nudo conduct in the arbitration.

45. Nudo is a principal and officer (Vice President) of Marc Realty, possessing a substantial ownership interest in and control of the entity. Nudo utilized Marc Realty as a primary conduit for accomplishing substantial elements of his misconduct in this case. Among other things, Nudo used Marc Realty systems and personnel as a primary means of accomplishing the myriad acts of conspiracy, fraud, breach of fiduciary duty, tortious interference, fraudulent transfer, and other misconduct alleged in this case. To this end, for example, Nudo used Marc Realty systems to communicate his actions and directives and used Marc Realty personnel and agents to accomplish his aims. This included Nudo using Marc Realty personnel, systems, and resources to substantially facilitate and assist in acts of fraud, conspiracy, and aiding and abetting breaches of fiduciary duty to: (i) administer the activities of NW loan and Voshel regarding the payment and receipt of funds pertaining to the Inland loans and Proteus collateral; (ii) in relation to foregoing, advancing funds to and for the benefit of Bryant in such a manner as to advance Bryant's interests in contravention of his fiduciary duties to Claimants and in so doing causing the Proteus collateral to be increasingly heavily encumbered; (iii) alienating and diverting the Proteus collateral and the value of the Proteus collateral to advance the interests of Bryant and Nudo at the expense of Claimants legitimate interests in that collateral; (iv) conspiring to conduct and purport to conduct three sham UCC sales of Proteus assets; and (v) engaging in and causing misrepresentations and acts of concealment to advance the misconduct.

**Bryant's Underlying Misconduct: The Backdrop of his Scheme with Nudo, NW, and Marc Realty**

46. Before Plaintiffs invested in Proteus, Bryant had caused Proteus to obtain general

business financing from Inland Bank ("Proteus Inland loan") posting all of the assets of Proteus Group as collateral for that financing. Bryant provided a personal guarantee of the Proteus Inland loan. Eventually, one of the aims of the conspiratorial and aiding and abetting actions of Nudo (directly and via entities such as NW, Voshel, and Marc Realty) was to assist Bryant to avoid responsibility for this and other guarantees and financial obligations.

47. The Proteus Inland loan represented the primary source of financing at Proteus. The security agreement with Inland did not describe the collateral to include commercial tort claims against Bryant.

48. Plaintiffs were aware of Proteus Inland loan and the Bryant personal guarantee when they invested in Proteus.

49. Also before Plaintiffs invested in Proteus, Bryant and Talbert had obtained the non-Proteus Inland loans from Inland in relation to businesses and/or personal affairs entirely separate from Proteus. The non-Proteus Inland loans for which Bryant had personally guaranteed included loans to HD Partners Residential, LLC ("HD Residential") and S&S System, LLC ("S&S"). Additionally, Talbert obtained a home mortgage from Inland, which was personal to Talbert and entirely distinct from the interests of Proteus. Plaintiffs had no interest in or knowledge of any of the non-Proteus Inland loans.

50. As alleged in Plaintiffs' SADA and Voshel's Intervention Demand, in or before 2009-10, Bryant engaged in serious mismanagement and self-dealing at Proteus without disclosing to or obtaining the required approval of Iuppenlatz, which included misapplication and misappropriation of Proteus funds and assets to personally benefit Bryant. This misapplication and misappropriation included without limitation the use of Proteus assets to pay debt due on the non-Proteus Inland loans personally guaranteed by Bryant. These activities placed Proteus in an out of balance position and damaged its cash flow.

51.     Eventually, Plaintiffs learned of the existence of the foregoing misconduct and objected to it but Bryant blocked Plaintiffs from learning more about or stopping the misconduct.

52.     In April 2010, Plaintiffs brought suit against Bryant in attempt to preclude the behavior and obtain remedy for it. This led to the filing of the first arbitral demand. The first arbitral demand included allegations that Bryant had improperly used Proteus funds to pay non-Proteus Inland loans.

53.     Nevertheless, as detailed in the SADA and Voshel's Intervention Demand, Bryant continued and exacerbated the mismanagement, self-dealing and diversion of Proteus assets to his own benefit, adding additional injury to Proteus and by extension to Plaintiffs.

54.     In about July 2010, Bryant's mismanagement and self-dealing at Proteus created serious pressures on the financial welfare of the business, which led Inland to express concern about Proteus' cash flow and to raise the possibility of a receivership if things did not improve. By implication, such a receivership would also likely trigger the Bryant personal guarantee on the Proteus Inland loan.

55.     Bryant did not disclose this to Plaintiffs nor did he disclose that a part of the concern of Inland related to the non-Proteus Inland loans.

56.     On or about January 1, 2011, the precarious financial affairs at Proteus caused by Bryant's misconduct and self-dealing led to the need for a refinancing at Inland, with Proteus executing a new note at Inland supplanting the prior Proteus Inland Loan and Bryant extending his personal guarantee.

**Bryant's Improper Entry into the Inland Note Without Plaintiffs' Knowledge and Consent.**

57.     On January 1, 2011, Bryant and Talbert caused Proteus Group to enter into a Promissory Note payable to Inland Bank in the amount of $3,471,265.65. (the "Inland Note").

To secure the debt under the Inland Note, Proteus Group entered into a Commercial Security Agreement whereby Bryant and Talbert purported to cause Proteus Group to grant Inland Bank a security interest in all the assets of Proteus Group.

58.     Plaintiffs already had initiated the first arbitration against Bryant but the security agreement with Inland did not include any commercial tort claims (or any other claims) against Bryant as part of the collateral described.

59.     Bryant and Talbert failed to notify Iuppenlatz of: (i) their intent to cause Proteus Group to enter into the Inland Note; (ii) any negotiations regarding the Inland Note; and (iii) the closing of Inland Note transaction. Bryant and Talbert also failed to notify Iuppenlatz that the assets of Proteus Group were being pledged as collateral for the Inland Note.

60.     Most importantly, Bryant and Talbert failed to solicit and obtain Plaintiffs' consent and approval to enter into the Inland Note as required by the Proteus operating agreements and in accordance with their fiduciary and contractual duties.

61.     Six months later, in or about July 2011, as a result of pressure from Inland, Bryant and Talbert improperly caused Group to enter into a Cross Default, Cross-Collateralization and Omnibus Amendment Agreement ("1st Cross-Collateralization") with Inland, without disclosing to Iuppenlatz or obtaining the required approval from Iuppenlatz, which was a breach of the Operating Agreements and the fiduciary duties Bryant and Talbert owed to Plaintiffs.

62.     By this 1st Cross-Collateralization, Bryant and Talbert fraudulently caused Group to pledge all of its assets as collateral in support of the non-Proteus Inland loans of Bryant's entities and Talbert as well as the Proteus Inland loans. This magnified the financial pressure on Proteus Group benefitting Bryant and Talbert personally with no benefit to Proteus Group or Proteus Holdings.

63.     Bryant and Talbert thereby breached their fiduciary duties to Proteus and

Plaintiffs for myriad reasons including by: (a) causing Proteus to take on substantial financial debt wholly unrelated to its operations while elevating their personal interests in non-Proteus loans above the best interests of the Proteus; (b) entering into a contract that could adversely affect the financial condition of the Proteus Group; (c) allowing or causing Proteus Group to enter into any action outside the ordinary course of business affecting Proteus Group assets without the consent of Iuppenlatz; and (d) making decisions at Proteus Group involving refinancings or incurring any indebtedness for Proteus Group without the consent of Iuppenlatz.

64. Despite Bryant's and Talbert's effort to conceal the 1st Cross-Collateralization from Iuppenlatz, Iuppenlatz eventually learned of the 1st Cross Collateralization, vigorously objected, and included this as an allegation of misconduct in the first arbitration demand (by way of amended demand).

**Plaintiffs' Cook County Lawsuit on the MI Note and Initial Arbitration Award.**

65. In or about December 2011, MI brought suit in the Circuit Court of Cook County against Group, Bryant, and Talbert for default on the MI Note. At the time, the first arbitration was still pending.

66. In or about July 2012, Plaintiffs obtained an in the first arbitration an arbitration award against Bryant regarding his misconduct and self-dealing at Proteus. The arbitration award is an exhibit to the SADA and to Voshel's Intervention Demand. The arbitration award included a ruling that the payments Bryant caused Proteus to make to Inland on the for non-Proteus loans were improper as was the execution of the cross-collateralization agreement. The arbitration award also ruled that Bryant's and Talbert's self-dealing with to various payments they caused to be made to or for their own benefit, along with their utter failure to solicit or obtain the consent of Iuppenlatz prior to making the payments constituted a willful breach of the duty of their loyalty.

**Continued Pressure from Inland and Bryant's Continued Efforts to Negotiate with Inland Without Plaintiffs' Knowledge and Consent.**

67.     Inland continued to exert pressure on Bryant due to the status of the Proteus and non-Proteus loans for which Bryant had personal guarantees, which pressure was severely heightened by Bryant's continued misapplication of funds from Proteus to his personal interests. These misapplications now rose to the tune of millions of dollars.

68.     The Bryant-guaranteed loans for S&S and HP Residential continued to be outstanding and accruing interest, which upon information and belief also placed pressure on Bryant.

69.     By late 2012, Iuppenlatz received general word from a third-party that notwithstanding the arbitration award rulings condemning Bryant's self-dealing at Proteus, including with regard to Inland, Bryant was attempting to renegotiate with Inland regarding Proteus' loan again, without the participation or knowledge of Plaintiffs.

70.     Iuppenlatz became quite concerned about Bryant's undisclosed and unauthorized negotiations with Inland.

71.     In November-December 2012, Plaintiffs repeatedly objected to Inland, noting that Bryant lacked the authority to negotiate on behalf of Proteus without Iuppenlatz's approval and involvement.

72.     On or about December 12, 2012, Plaintiffs' counsel wrote to Inland (copying Bryant and Talbert):

> Proteus Holdings, LLC owns 78% of the shares of Proteus Group and pursuant to the Proteus Holdings, LLC Operating Agreement, Proteus Group, LLC may not enter into any new loan obligation or modify any existing loan obligation without the unanimous consent of the Managers of Proteus Holdings, LLC, which includes Mark Iuppenlatz.

… You are hereby further notified that under the terms Section 7.2(e) of the Proteus Holdings, LLC Operating Agreement (a copy of which is attached), Mark Iuppenlatz, in his capacity as a Manager of Proteus Holdings, LLC, must be included in all negotiations between Inland Bank, Proteus Holdings, LLC and/or Proteus Group, LLC and must approve any new agreement or modification of any existing agreement between Inland Bank, Proteus Holdings, LLC, and/or Proteus Group, LLC."

73.     Nevertheless, Bryant continued improperly to conceal the negotiations from Iuppenlatz and otherwise exclude him.

**The Onset of the Scheme between Nudo, NW, Voshel, and Marc Realty and Bryant to Employ Various Artifices and Deception Falsely and Fraudulently to: Advance the Bryant Misconduct and the Continued Breaches; Aid and Abet Bryant's Continued Breaches; and Defeat Plaintiffs' Ability to Recover Against Bryant for his Fraud and Other Misconduct in Relation to Proteus Group**

74.     In the wake of the adverse arbitration ruling against him, MI's suit against him on the MI Note, and the continuing pressure from Inland, Bryant hatched a scheme to defraud and breach his contractual and fiduciary duties to Plaintiffs by deceptively and covertly acting to undermine Plaintiffs' ability to obtain recovery against Bryant for the Bryant Misconduct, the Continued Breaches, and his self-dealing and misappropriation of funds, by secretly and improperly purchasing Proteus' Inland Bank loan and the rights to the underlying Proteus assets pledged as collateral as well as also purchasing the non-Proteus loans.

75.     Bryant's objective was to eliminate his personal debt and at the same time attempt to obtain secured rights to Proteus assets that were superior to Plaintiffs in order to defeat Plaintiffs' ability to pursue their claims against Bryant as to his misconduct against them and his misappropriation of Proteus assets.

76.     Bryant knew or had reason to know that the Proteus operating agreements did not permit him to acquire Proteus loans or collateral rights without obtaining the approval of Plaintiffs. Bryant also knew or had reason to know that acquiring the Proteus loans and collateral

rights to enhance his personal interests and without the knowledge or approval of Plaintiffs would be a breach of his fiduciary and contractual duties.

77.     Through his negotiations with Inland, Bryant knew or had reason to know that he needed to be able to finance the purchase of the Proteus loans and collateral rights and thus would need an investor for this element of the arrangement. Bryant entered into discussions with Nudo to facilitate his efforts.

78.     At the time, Nudo was involved in numerous other business arrangements with Bryant, including NB 333 W. Cork Street, LLC, Double Dough 7, LLC, Tri-Cities 2012 LLC, and WVUH MOB I LLC. Over the ensuing years, the Nudo-Bryant business relations grew exponentially expanding to additional businesses like NB Sierra Bloom, LLC, BN ICON, LLC, Linden Propco, LLC, Michigan-180 Property, LLC, Kennewick WA 2012 LLC, and Washington Medical Holdings I, LLC.

79.     In August 2014, MI obtained a judgment against Proteus and Bryant in the Circuit Court of Cook County on the MI Note.

**The Scheme of Nudo/NW/Voshel/Marc Realty and Bryant to Fraudulently, Deceptively and Covertly Acquire the Rights to Proteus Group Assets to Permit the Continued Improper Diversion of Proteus Assets and Violation of Bryant's Fiduciary Duties to Plaintiffs and to Knowingly, Intentionally and Recklessly Deny Plaintiffs and MI the Ability to Recover on Their Claims**.

80.     *Litigation Pressures from Plaintiffs and MI*. In or about April 2014, Iuppenlatz filed a verified motion in the Circuit Court of Cook County to put Proteus Group into receivership due to continued siphoning of funds from Proteus by Bryant and Talbert. The Court's ruling on the receivership motion noted that Bryant and Talbert did "not dispute the majority of facts alleged by Plaintiffs' Verified Motion." The Court further found:

> Here, Plaintiffs allege that, through the forgiveness of sham loans and other
> transactions, Bryant and Talbert have effectively diverted more than $5 million of

Proteus Group assets to themselves and other entities that they own or control. Plaintiffs' verified, well-pled allegations of self-dealing and siphoning of Proteus assets-the majority of which Defendants do not dispute in their response-are disturbing and sufficient to shift the burden to Bryant and Talbert to demonstrate that the challenged transactions were entirely fair to the Proteus entities and their members. Despite this burden, Bryant and Talbert have asserted nothing in their response to suggest that the forgiveness of the aforementioned loans were at all fair to Proteus Group or its members. Accordingly, Plaintiffs have raised a fair question that Bryant and Talbert have breached their fiduciary duties of loyalty to Proteus Group by causing the company to enter transactions from which they stand to personally benefit.

81. At the same time that MI was pursuing a judgment against Bryant and Proteus on the MI Note, Plaintiffs also worked to obtain confirmation of their arbitration award

82. *Bryant's and Nudo's Scheme to Avoid the Litigation Risk from Plaintiffs*. Beginning at latest by in or about mid-2014, Nudo (and later NW, Voshel, and Marc Realty) joined and agreed to join and advance Bryant's scheme to defraud and breach his fiduciary and contractual duties to Plaintiffs including by deceptively and covertly acting to defeat Plaintiffs' ability to recover against Bryant for his alienation of millions of dollars of Proteus Group assets, to wit, by engaging in manipulation, deception, and concealment to undermine Plaintiffs' ability to collect against Bryant for his improper prior and continuing diversion of Proteus Group assets and other misconduct.

83. Most significantly, Nudo began to assist Bryant in relation to the Bryant's Inland negotiations and an arrangement with Inland by which to acquire Inland's claims against Proteus collateral so as to effectively prevent Plaintiffs to pursue and recover on their claims.

84. At the same time, faced with the possibility of multiple judgments, Bryant and his counsel began communications with Inland on a strategy to "buy-out Inland" via a "discounted purchase of loan documents and claims."

85.     From very early on, Nudo participated and planned with Bryant to provide funding for this endeavor.

86.     From in or about April-September 2014, Bryant and Nudo repeatedly discussed the contours and status of the potential arrangement with Inland to acquire the Proteus loan, including using the potential Inland deal as a "defensive strategy" against a Iuppenlatz judgment.

87.     Also during this time, Bryant's counsel repeatedly emphasized to Inland that the transaction was important "in light of the Iuppenlatz case and potential judgment."

88.     In or about April-May 2014, the initial proposal and communications from Bryant to Inland described a "Note purchase agreement" and referenced that Bryant had an investor that would participate on his side of the transaction.

89.     On or about May 12, 2014, Bryant crafted for review by Nudo and his counsel a proposal regarding the purchase of the Inland Proteus loan documents.

90.     On or about May 13-14, 2014, Bryant's counsel reviewed and revised a "proposed written offer from Nudo" to "purchase the notes and loan documents" from Inland.

91.     On or about May 20-21 and May 28-30, 2014, Bryant's counsel presented the proposal to Inland and communicated repeatedly with Inland regarding a "draft Note Purchase and Sale Agreement" with them.

92.     During this same time Bryant and his counsel also coordinated with a Nudo and his counsel.

93.     In about June and July 2014, negotiations with Inland slowed over questions as to how much of the debt at Inland would be included in the transaction as well as the amount

proposed for the purchase. Among other things, the parties disagreed about whether the buyers would pay more to purchase all of the Inland debt.

94.     On or about July 24, 2014, Bryant considered "some increase in the offer in light of a potential Iuppenlatz judgment."

95.     On or about August 14, 2014, Bryant and Bryant's counsel met with counsel for Nudo to discuss "status and strategy issues with Inland, and in light of potential Iuppenlatz judgment."

96.     In August and November 2014, the Circuit Court of Cook County entered final orders in favor of MI against Proteus Holdings, Bryant and Talbert for $1,317,140.78 in damages and $109,08846 in attorneys' fees, for a total of $1,426,229.24.

97.     [Later in connection with post-judgment proceedings: (i) on March 4, 2015, the court entered a charging order in favor of MI Management and against Proteus Holdings' distributional interests in Proteus Group; (ii) on July 6, 2015, the court entered additional judgments in favor of MI Management and against Proteus Group, which the trial court later vacated but then the Illinois appellate court reversed, leading to the judgments being reinstated *nunc pro tunc* on February 11, 2019.]

98.     In the fall of 2014, issues arose with respect to the validity of the prior arbitration award against Bryant, and Plaintiffs notified Bryant on October 14, 2014 that they would file a second arbitration demand.

99.     On December 23, 2014, after the parties agreed to have Judge Neville serve as arbitrator, Plaintiffs filed the initial arbitration demand in the Arbitration.

**The PHDS Scam.**

100.     In or about late 2014-early 2015, the possibility of an arrangement with Inland began to coalesce.

101.     Bryant and his counsel drafted documents for and created a new entity named PHDS Acquisitions, LLC ("PHDS"), to be used to acquire for Bryant Inland's Proteus and non-Proteus loans and Inland's superior rights to the collateral of Proteus Group so as to supervene Plaintiffs' claims and defeat the ability of Plaintiffs to pursue their claims against Bryant and their derivative claims against Proteus.

102.     PHDS was and is Bryant's alter ego and nominee. Bryant controlled and dominated PHDS because, *inter alia*, he was the sole manager of and decision-maker for: (i) PHDS; and (ii) PHDS's sole member, PHDS Management, LLC. PHDS had no employees, used the same office address and email address as Bryant's other businesses. PHDS had no function other than to supposedly own the Inland loans, to obtain loans from Nudo's entities to purchase the Inland loans, and to transfer effective control over the loans and the Proteus Group assets to Nudo and his entities including NW and Voshel.

103.     Simply put, PHDS was a façade for Bryant (and Nudo) created for the purpose of diverting the Proteus Group assets for the personal benefit of Bryant at the expense of Plaintiffs' legal rights and financial interests.

104.     Meanwhile, the pressure from Inland increased. In or about early April 2015, Inland acted against Bryant's personal assets due to Bryant's personal guarantees of the Inland loans, that it, Inland began to sweep funds from Bryant's personal account to pay the debt owed.

105.     On or about April 23, 2015, PHDS purchased for $1.05 million from Inland the Proteus and non-Proteus loans that Bryant had personally guaranteed, and that had been collateralized by the Proteus assets. Notably, however, as part of the loan purchase transaction,

Inland agreed to return to Bryant personally $27,413 that it had swept from his personal account in relation to the loan debt in April 2015. Thus, although the purchase was for $1.05 million, the net amount paid was $1,022,587 ($1.05 million less $27,413).

106.     The purchase was structured as a cash payment by PHDS of $750,000 plus a note by PHDS to Inland in the amount of $273,000.

107.     The PHDS loan purchase from Inland was for a highlydiscounted amount. Bryant and Nudo later asserted that the total amount due on the several purchased loans was approximately $4.75 million. This included $2.6 million due on the Proteus Inland loan, approximately $625,000 due on the HD Partners loan and $684,120 due on the S&S loan. Upon information and belief, the amount due on the Talbert home mortgage. Accordingly, the Proteus Inland loan represented approximately 54.7% of the debt PHDS acquired.

108.     Given that PHDS paid $1,022,587 for the Inland loans, the proportionate amount attributable to the Proteus Group assets was $559,732 (54.7% of $1,022,587).

109.     The loan purchase agreement did not extinguish the loans but instead assigned the loans to PHDS, making the debt owed under the Proteus Inland note and the other non-Proteus debts payable to PHDS – *i.e.*, Bryant.

110.     The loan documents also specifically released Bryant and his entities and terminated his guarantees of the loans.

111.     At the time of the execution of the foregoing documents and the transfer of the Proteus Inland Note to PHDS, Proteus Group, and Proteus Holdings were going concerns and their operating agreements were (and remain) in full force and effect. This includes the provisions that required Iuppenlatz approval of any transaction involving the Proteus Inland note,

Proteus Group assets and other actions related to Proteus Group, including those referenced above.

112.    In fact, Schedule 1.1 of the Proteus Holdings Operating Agreement defines an "affiliate" of Proteus Holdings as any entity that is indirectly or directly owned or controlled by Bryant, Talbert, or Iuppenlatz. Thus, per that provision, PHDS is an "affiliate" of Proteus Holdings because Bryant indirectly owns and controls PHDS.

113.    Completion of the Proteus Inland Note assignment to PHDS constituted multiple breaches of Bryant's contractual and fiduciary duties to Plaintiffs under the Proteus Operating Agreements and otherwise because it was a transaction that required unanimous consent of all the managers of Proteus Holdings, including Iuppenlatz, but was taken without Iuppenlatz's approval and because: (a) it transferred control of Proteus Group assets, it was a sale or otherwise disposition of assets outside the ordinary course of business; (b) as a transfer to a Bryant Affiliate that included Proteus Group approval, it was a transaction between Proteus Group and any Manager or any Affiliate of any manager not expressly permitted under the Proteus Holdings Operating Agreement; (c) it involved the incurrence of indebtedness for Proteus Group (to PHDS); (d) it was a decision or action at Proteus Group that required approval by Proteus Holdings as owner of 77% of the membership interests of Proteus Group; (e) it was an action by Proteus Group outside the ordinary course of business; and (f) it was contract that could adversely affect the financial condition of Proteus Group.

114.    Nudo/NW and Bryant knowingly, intentionally and recklessly executed and caused the execution of the PHDS transactions without providing notice or obtaining the approval of Iuppenlatz. In so doing, Nudo encouraged, participated, and facilitated Bryant's breach of his contractual and fiduciary obligations to Plaintiffs.

115.     Nudo/NW and Bryant knew and intended that by purchasing the Inland loans without disclosing this to Plaintiffs, PHDS would allege that it had a superior claim to Proteus' assets and thereby would act to deflect and defeat any claims by Plaintiffs.

116.     In or about 2015, Bryant falsely misrepresented to Iuppenlatz that Inland sold the Inland Note at a severe discount to a "shark debt collection" group that was likely to foreclose upon the Inland Note, intentionally concealing the truth from Iuppenlatz.

117.     Bryant then informed Iuppenlatz that Iuppenlatz's efforts to recover the funds that Bryant and Talbert improperly transferred from Proteus Group would be futile in that any funds recovered by Proteus Group would instead be used to repay the Proteus Inland Note. Bryant well knew that the value of the Proteus assets that he had falsely and fraudulently diverted from Proteus dwarfed the value of the Proteus Inland Note and was many multiples of the amount PHDS paid Inland for the Proteus and non-Proteus Inland Notes.

118.     Bryant and Nudo/NW sought to conceal the PHDS transaction by causing the loan purchase agreement to include Section 12.15, making the agreement confidential and preventing its disclosure "by seller or purchaser to any third-party whatsoever."

119.     With Nudo's participation, knowledge, and assistance, Bryant breached his contractual and fiduciary obligation to Plaintiffs by failing to notify Plaintiffs and obtain their approval of this transaction.

120.     Nudo agreed with and conspired with Bryant and knew and intended that he would and did facilitate and aid and abet Bryant's actions by, *inter alia*, providing the vast bulk of the financial support needed to accomplish this transaction.

121.     On or about April 23, 2015, Nudo/NW substantially facilitated PHDS's purchase of these several Inland loans by providing the vast bulk of the financial support for the purchase:

a Nudo-owned entity, NW Loan (c/o Marc Realty), loaned PHDS $650,000 of the $750,000 cash paid to Inland and Nudo personally guaranteed the $273,000 note PHDS executed with Inland. [Eventually, NW Loan/Voshel covered the lion's share of this portion of the obligation as well.]

122.    The $650,000 promissory note between PHDS and NW was directly tied to Marc Realty and its interests, providing for Proteus to enter into a lease in a building managed and leased by Marc Realty substantially in the form of a lease attached to the note as an exhibit.

123.    Nudo/NW and Bryant knew and had reason to know that had Plaintiffs received notice regarding the PHDS transaction with Inland, Plaintiffs would not have approved the transaction and vigorously would have opposed it. Nudo and Bryant also knew and had reason to know that that had Plaintiffs received notice regarding the PHDS transaction with Inland, Plaintiffs would have provided all needed financing for the transaction in lieu of any involvement by Bryant business partner Nudo so as to preserve Plaintiffs' rights as to their claims against Bryant and Proteus, as well as to take advantage of this outstanding business opportunity to substantially reduce the third-party debt on Proteus and to obtain the benefit of debt due on the non-Proteus assets.

124.    For these reasons, to shield Bryant from vulnerability to the litigation threats from Plaintiffs and to facilitate the additional diversions of assets from Proteus Group that occurred thereafter, Nudo and Bryant intentionally and recklessly concealed the transaction from Plaintiffs so as to defraud Plaintiffs out of their valuable financial interests. In so doing, Nudo encouraged, participated, and facilitated Bryant's breach of his contractual and fiduciary obligations to Plaintiffs.

**Nudo and Bryant Intentionally Executed Agreements as Part of the PHDS Transaction to: Conspire with Bryant; Aid and Abet his Breaches of Fiduciary Duty; and Interfere With and Defeat the Ability of Plaintiffs to Pursue Their Claims Against Bryant in Relation to the Proteus Assets.**

125.     To document the obligation of PHDS to reimburse Nudo and NW Loan for the heavy financial support provided to PHDS used to purchase the Inland loans, Nudo and Bryant entered into various agreements that included terms intentionally drafted to interfere with the ability of Plaintiffs to pursue their claims against Bryant in relation to the actions, he had taken to damage Proteus assets.

126.     These agreements included a reimbursement agreement executed April 23, 2015 — on the same day as the PHDS loan purchase from Inland — requiring PHDS to pay a 12% interest rate plus substantial fees.

127.     *Collateral Assignment*. Very significantly, also on April 23, 2015, with Nudo's knowledge, participation, and consent, PHDS executed a Collateral Assignment of Loan Agreements ("Nudo Collateral Assignment") to NW Loan and Nudo, which gave NW Loan and Nudo control over the several loans purchased from Inland and thus effectively over all of the Proteus assets. With Nudo's knowledge and participation, Bryant also caused Proteus Group to consent to the Nudo Collateral Assignment – despite the fact that Bryant did not inform, seek, or obtain Plaintiffs' consent to permit Proteus Group to agree ceding control over Proteus assets to Nudo. This action was a breach of multiple provisions of the Proteus Operating Agreements and the fiduciary duties Bryant owed to Plaintiffs.

128.     Under a Collateral Assignment of Mortgage and Other Documents dated April 23, 2015, PHDS also assigned the Talbert home mortgage to NW Loan and Nudo, meaning that the amount due to NW had recourse against any equity in the Talbert home.

129. Paragraph 1 of the Nudo Collateral Assignment assigned the security interests under the loans and also assigned to NW Loan and Nudo "full authority to act in assignor's name… regarding collateral, and to perform, acts Assignor could perform." In this way, Nudo and Bryant intentionally conferred upon Nudo the ability to default Proteus for the nonpayment of any of the loans.

130. At this early date, it is already apparent that Nudo and Bryant anticipated attempting to use the UCC to facilitate their scheme, for Paragraph 10 Collateral Assignment provides that in the "event of default, Assignee shall have all the rights and remedies of a secured party under the applicable Uniform Commercial Code."

131. On or about October 10, 2015, NW Loan and Nudo assigned the loan agreements to Voshel.

**Nudo Participated Substantively in the Affairs of Proteus Group and PDHS following the Execution of the PHDS Transactions.**

132. Following the execution of the PHDS transaction including the elements of the Collateral Assignment to which Nudo agreed and which that gave NW Loan and Nudo control over the several loans purchased from Inland and thus effectively over all of the Proteus assets, Nudo-NW actively participated in the affairs of Proteus Group.

133. For example, on or about August 8, 2016, the parties recounted that throughout 2016, Bryant had "caused Proteus to divert substantial amounts of money from its Citibank account to pay entities for the benefit of Todd including [Bryant-owned entity] Healthcare Development Partners, its employees and its creditors" and that Bryant had "refused to provide Proteus records for the Citibank account in Proteus' name." This email was then forwarded to Nudo.

33

134. As another example, in or about August 2016, Nudo and Bryant caused Proteus Group to execute a contract to provide architectural and engineering services for their joint entity NB 333 West Cork Street, LLC, which was involved in a construction project in Winchester, Virginia.

135. As another example, in April 2017, Nudo addressed litigation expense issues exchanged emails with the lawyer Bryant hired in the Cook County litigation and the arbitration (Stuart Kusper) regarding accessing Proteus documents at a vendor.

136. Nudo also used Marc Realty resources and personnel to administer Proteus matters such as payments to Proteus vendors and administration of the Proteus loan.

137. Nudo thereafter complained that Bryant was putting too much responsibility for Proteus on Nudo and urged Bryant to take greater responsibility of the issues arising at Proteus.

**2015-2017: Bryant and Nudo Took Significant Steps to Cause the PHDS Debt to Nudo/NW/Voshel to Remain Unsatisfied and to Ensure that the Security Interest in the Proteus Assets Would Remain Encumbered and Under the Control of Nudo/NW/Voshel**

138. Following the Collateral Assignments transferring substantial control over the Proteus assets to Nudo-NW, meaningful payments were made on the interest and principal on PHDS's loan due to NW.

139. Very significantly, however, despite the fact that PHDS used the NW loan to purchase not only the Proteus Inland loan but also three substantial non-Proteus Inland loans and that these three non-Proteus loans were then assigned as collateral to NW permitting NW to administer all of the transferred loans, all or substantially all of the interest and principal paid on the loan came exclusively from the proceeds of the operations of Proteus Group.

140. Upon information and belief, Nudo/NW/Voshel never demanded payment from Bryant personally (nor did Bryant make any such payment) even though the HD Residential and

S&S loans that had been transferred to Nudo/NW/Voshel and Bryant had personally guaranteed payment on those loans.

141.   Equally significantly, Nudo and Bryant took steps to reduce the value of the interest and principal payments received from Proteus by causing PHDS to add significantly to the debt owed to Nudo/NW/Voshel over the years following the initial financing. This increased the interest payments required, reduced the funds available to pay principal and maintained the encumbrance upon the Proteus assets.

142.   Paragraph 3 of the Nudo Collateral Assignment included a provision that allowed the parties to add additional debt on top of the $650,000 loan amount initially in place.

143.   After execution of the original NW loan document and the Nudo Collateral Assignment, PHDS (through Bryant) entered into a series of amendments of the Note with NW/Voshel (through Nudo) in or about 2016 and 2017. These amendments increased the amount due on the notes to over $900,000.

144.   Eventually, in 2017, PHDS (through Bryant) and Voshel (through Nudo) altered the arrangement to convert the note to a revolving loan permitting PHDS to take "advances" as needed without having to document the arrangement with additional amendments. This evinced that there was no intention to pay down the debt to free the Proteus Group collateral.

145.   The agreement leading to the revolving loan also added onto the debt encumbered the Proteus assets significant additional transfers that had been made previously and not referenced in any note amendment that had occurred, which were now being added onto the sum due on the note. These transfers include but are not limited to: $10,000 on October 18, 2016; $189,635 on December 28, 2017; $15,000 on January 10, 2017; $10,000 on January 19, 2017; and $5000 on January 23, 2017.

**PHDS/Bryant and Nudo/Voshel Repeated Concerted Behavior to Utilize Deception and Concealment to Transfer Proteus Group Assets Improperly Acquired from Inland Defeat Plaintiffs' Efforts to Recover.**

> **Late 2016: Nudo/Voshel and Bryant Attempt But Fail to Secretly Transfer Proteus Group Assets Without Disclosure to Plaintiffs to Defeat Claimant's Claims Via Their First Sham UCC Sale.**

146.    Beginning in or about September-October 2015, PHDS (through Bryant and with Nudo's knowledge and consent) retained Johnson Legal Group ("Johnson") as counsel for PHDS to begin to take steps to utilize the leverage gained over the Proteus loan to effectuate a default on the loan. Bryant directed its activities as is evident in, *e.g.*, the invoices Johnson sent for its work for PHDS directed Attention Todd Bryant" and directed to Bryant and his assistant, Nancy Rich, at HD Partners (a Bryant owned and controlled company).

147.    Johnson also acted on behalf of and for the benefit of Nudo/NW/Voshel, reporting to them as well as Bryant/PHDS. Nudo/NW/Voshel funded Johnson's legal work. Voshel has produced Johnson invoices for legal work performed for PHDS. Notice and information that Johnson received as counsel for the interests of Bryant and Nudo-Voshel are attributable to Bryant, Voshel, and Nudo.

148.    In or about late 2015, Bryant caused Johnson on behalf of PHDS to send a letter to Talbert announcing that Proteus Group was in default on the loan acquired from Inland. [There is no independent proof that the default was valid and as detailed in this Counterclaim, Proteus Group continued to make payments to NW/Voshel on the PHDS note.]

149.    Bryant also improperly failed to notify Plaintiffs of the alleged default even though they are members and managers of Proteus Holdings and derivative owners of Proteus Group.

150. Bryant (with Nudo's knowledge and consent) did this to set the stage for repeated attempts to use the security interest in the Proteus assets that PHDS had acquired from Inland by fraud and breach of Bryant's fiduciary duties to Plaintiffs to defeat and undermine the ability of Plaintiffs to recover on those assets.

151. In or about the second half of 2016, Bryant and Nudo formulated a scheme to use PDHS's fraudulently obtained security interest in the assets of Proteus Group to covertly and fraudulently convey those assets away from Proteus Group via a UCC sale without disclosing the sale to Plaintiffs, in an attempt to remove the assets from the reach of Plaintiffs and defeat their ability to recover.

152. Bryant and Nudo did this knowingly and recklessly notwithstanding the fact that: (i) MI was a perfected secured creditor of Proteus Group; (ii) the putative sale was contrary to the rights of Plaintiffs under the Proteus operating agreements; and (iii) the putative sale without Plaintiffs' knowledge and consent breached myriad Bryant's fiduciary and contractual duties to Plaintiffs.

153. Nudo and his counsel actively participated in the discussions regarding the UCC sale from the earliest stages going back as far as on or about September 1, 2015.

154. In or before October 2016, Bryant, Nudo/Voshel developed a plan by which PHDS would use cause a UCC sale of "all of the assets of Proteus [Group]" based upon the security interest PHDS's fraudulently obtained in Proteus Group by fraud and in breach of Bryant's fiduciary and contractual duties, with the plan being that PHDS would acquire the Proteus Group assets by credit bidding the amount of the various loans PHDS purchased from Inland.

155.    On or about October 28 and November 9, 2016, Bryant and Nudo communicated regarding the plan that PHDS would assign the Proteus Group assets to another architectural firm named Ingenious Architecture ("Ingenious"), which would continue on with the business of Proteus Group.

156.    Unquestionably, this transaction would leave and was designed to leave Proteus Group as an empty shell.

157.    In addition to diverting the value of Proteus Group as a going concern, the transaction was designed to defeat or impair Plaintiffs' basis for recovery in this arbitration.

*1st Sham UCC Sale Initially Scheduled for November 29, 2016.*

158.    Bryant and Nudo caused Johnson to schedule the UCC sale for November 29, 2016.

159.    No notice was delivered to Plaintiffs notwithstanding the fact that MI Management was a secured creditor, Iuppenlatz had substantial interests and rights in Proteus, and Bryant owed contractual and fiduciary duties to Plaintiffs.

160.    Bryant and Nudo were well-aware as far back as September 1, 2015 that a valid UCC sale required notice to the secured creditors of Proteus Group.

161.    Especially in light of the foregoing, the failure of Bryant, Nudo, and Johnson to deliver notice of the UCC sale to Plaintiffs was knowing, intentional and reckless.

*1st Sham UCC Sale Rescheduled When Claimant Learned About it at the Last Moment*

162.    On November 29, 2016, the very day of the scheduled sale, Plaintiffs discovered through a third party that PHDS had scheduled the sale of the assets of Proteus Group for that day.

163. Plaintiffs' counsel immediately telephoned and emailed Johnson as counsel for PHDS demanding that the UCC sale be cancelled due to: (1) objections regarding the lack of proper notice; and (2) the improper and unlawful nature of the underlying transaction through which PHDS obtained its purported security interest against the assets of Proteus Group.

164. PHDS counsel agreed to postpone the sale for one week until December 7, 2016.

*Plaintiffs Demand Proof of Proper UCC Sale Procedures and Provide Detailed Statement of Their Interests in the Proteus Assets and Why PHDS's Security Interest was Invalid*

165. On December 5, 2016 and again shortly thereafter, Plaintiffs demanded from PHDS: (1) any notices of default that were sent to Proteus Group; and (2) any notices of the UCC sale that were sent to the creditors of Proteus Group. PHDS never provided any documentation.

166. On December 6, 2016, Plaintiffs' counsel sent to Johnson a detailed letter placing counsel on notice as to: (1) the details of the interests of MI and Iuppenlatz in Proteus Group; (2) details as to how MI held a perfected security interest and judgment lien in Proteus Group; (3) a detailed explanation as to why PHDS' purported security interest in Proteus Group was (and is) invalid; (4) the specific provisions of Section 7.2(e) of the Proteus Holdings operating agreement barring Bryant from transferring the assets of Proteus Group to himself or other of his affiliates without unanimous consent of the board, which included Iuppenlatz; (5) the fact that any "attempt[] to strip Proteus Groups assets away from the company and transfer those assets through PHDS constitutes actionable violations of the Proteus Holdings operating agreement and Bryant's fiduciary duties"; and (6) the acquisition of the Proteus loan from Inland Bank at a significant discount constituted a breach of Bryant's fiduciary duties.

167. [Johnson, and thereby Bryant, Nudo, Voshel, and Marc Realty again received notice of these issues four months later, on April 6, 2017, in a case Johnson filed in the Circuit

Court of Cook County on behalf of PHDS, MI Management again made detailed disclosure of the specific bases of Plaintiffs rights regarding the Proteus Assets as referenced above (and in the SADA).]

168.     Following Plaintiffs' December 6, 2016 letter, PHDS rescheduled the UCC sale several times more after Plaintiffs repeatedly voiced the intent to obtain a court order barring the sale.

*Johnson Agrees to Permanently Postpone UCC Sale and Provide Notice if it is Ever Rescheduled*

169.     The last time this occurred, on January 4, 2017, Johnson on behalf of PHDS agreed again to continue the sale but indicated that PHDS would provide a one-week notice if the sale would occur. MI's counsel wrote: "[J]ust to clarify, you are also confirming the one-week advance notice if a UCC. sale were to continue?" PHDS counsel replied, "Yes I am."

170.     On or about January 11, 2017, Johnson had a joint meeting with Bryant, Nudo, and Nudo's counsel (Bryant in person and Nudo/counsel on the telephone) to discuss the attempted UCC sale and other matters regarding planning as to future secret maneuvers regarding Proteus assets. Among other things, they made the decision not to go forward with the sale.

171.     On or about January 11, 2017, Bryant and Nudo recognized that dropping the UCC sale would "alleviate the need ... to provide documents as to their many letters that they sent me," which letters included to the repeated requests for notices of default and notices to creditors regarding the sale.

172.     No such notice was ever sent to MI or Iuppenlatz. Upon information and belief, no other notices were sent as required under the UCC.

40

173.    Johnson's January 11, 2017 email to Bryant that he forwarded to Nudo recounted that Nudo and Bryant were undecided whether to continue to have Stuart Kusper ostensibly to continue to defend Todd in the litigation against Plaintiffs and it was planned that Bryant and Nudo would meet with Kusper to make this decision.

174.    Some of the discussions with Johnson involved Marc Realty personnel other than Nudo.

175.    On or about January 17, 2017, Nudo agreed to send another $10,000 to Kusper.

**Nudo/Voshel and Bryant Secretly Transferred All Proteus Group Operating Assets to Ingenious Architecture Without Disclosure to Plaintiffs to Continue Bryant's Diversion of Proteus Group Assets and Breaches of Fiduciary Duty and to Defeat Claimant's Claims.**

176.    The representations regarding the UCC sale that Nudo/Voshel and Bryant made and caused to be made to Plaintiffs in December 2016-January 2017 were false and fraudulent and were designed to misrepresent and conceal their improper transfer of Proteus Group assets, Bryant's breach of fiduciary duty, and their scheme to interfere with Plaintiffs' ability to recover on their claims.

177.    The UCC sale that Voshel/Nudo and Bryant purported to schedule was a scam.

178.    By late October 2016, Bryant and Nudo/Voshel had already acquiesced to the hiring certain Proteus Group employees by Ingenious Architecture.

179.    Moreover, even before the time the UCC sale was first scheduled to occur on November 29, 2016, PHDS had already transferred away the assets and business operations of Proteus Group to Ingenious, including Proteus Group' ongoing work and employees.

180.    PHDS specifically alleged in a later-filed lawsuit "[o]n or about November 1, 2016, Proteus accepted Ingenious' offer" "to assume Proteus's obligations under the Note" identified as that which "PHDS purchased from Inland" on or about April 23, 2015. *PHDS*

*Acquisition, LLC v. Ingenious Architecture, LLC*, 2017-L-010593, Complaint, ¶¶ 5, 8-9 ("PHDS/Ingenious Lawsuit.").

181.    In the PHDS/Ingenious Lawsuit, PHDS specifically alleged that in return for the agreement of Ingenious Architecture to assume Proteus' obligations under the Proteus Inland Note, Proteus Group assigned to Ingenious Architecture "certain architectural projects it was working on and allow[ed] Ingenious to hire away Proteus's architects working on the assigned projects." *Id*. at ¶ 9. The Complaint also specifically asserts that Ingenious immediately "employed architects employed by Proteus on the same architectural projects Proteus was working on. In fact, on some occasions, employees of Ingenious held themselves out as Proteus to healthcare providers." *Id*. at ¶ 20.

182.    Nudo and Bryant knew of and approved of the content and filing of the PHDS complaint against Ingenious including the foregoing allegations. Nudo and Bryant received more than one draft of the PHDS complaint before it was filed, and PHDS's counsel conferred with Bryant and Nudo about the lawsuit.

183.    In fact, in December 2016, Ingenious Architecture replaced Proteus on a contract to provide architectural and engineering services at 333 W. Cork with Bryant's and Nudo's knowledge and approval. Moreover, Ingenious Architecture used the same address as Bryant's other businesses, Bryant signed Ingenious Architecture checks, and Ingenious Architecture made payroll payments to the now-former Proteus Group employees.

184.    Very significantly, the PHDS/Ingenious Complaint leaves no question that after the alleged transaction, nothing was left of Proteus Group, for PHDS specifically alleges, "[o]n or about November 1, 2016, Proteus ceased operating" and "became insolvent." *Id*. at ¶¶ 17, 21.

185.    In a January 4, 2018 email Talbert sent to Bryant – that Bryant then forwarded to Nudo – in which Talbert stated that they needed to obtain an "accounting of": (i) "monies that disappeared from Proteus AR because he [Ingenious] took the company [Proteus]"; and (ii) "how much money they [Ingenious] have earned from former Proteus clients and leads since he [Ingenious] took the company [Proteus]."

186.    Thus, at the time that Nudo/Voshel and Bryant communicated with Plaintiffs regarding the purported UCC sale of Proteus Group's assets from in or about November 29, 2016-early January 2017, they knew and had reason to know that those assets had already been transferred without the benefit of any foreclosure or UCC sale.

187.    Nudo/Voshel and Bryant engaged in the transaction with Ingenious in contravention of the rights of Plaintiffs and in breach of the fiduciary and contractual duties that Bryant owed to Plaintiffs, including those detailed in Plaintiffs' December 6, 2016 letter to PHDS.

188.    A January 11, 2017 email that Bryant forwarded to Nudo references this generally, "Todd [Bryant] is getting in touch with Frank [Talbert]" and "Todd understands that keeping Frank happy and feeling like he's on the same side as Todd/Proteus, PHDS, *Ingenious*, etc…." (Emphasis supplied.)

189.    When the PHDS/Ingenious Lawsuit and related litigation with Ingenious Construction LLC (affiliated with Ingenious Architecture) was eventually settled, Bryant (though Bryant entity, Columbia River, LLC) and Nudo (through Voshel) formed another entity, BN ICON, LLC, as a vehicle for obtaining an interest in Ingenious and by extension in the Proteus assets they caused to be transferred to Ingenious. Under the agreement, BN ICON became an "Economic Participant" in Ingenious Construction. In or about 2021, BN ICON sold 1.1 million

shares of non-voting common stock to IngeniousIO, Inc. and retained ownership of 280,000

shares and Ingenious, receiving $429,000. Bryant and Nudo the distributed these funds to

themselves. These funds were thus proceeds of the Proteus assets that Bryant and Nudo caused to

be transferred to Ingenious in or about November 2016.

*Bryant/Nudo Concern About Possible Disclosure of their Scheme.*

190.    Very significantly, as of January 11, 2017, Bryant and Nudo were concerned that

Talbert might potentially disclose details of their conspiracy to Plaintiffs.

191.    A January 11, 2017 email that Bryant forwarded to Nudo states: "… keeping

Frank happy... is a good idea since, otherwise, he might cut a deal with Iuppenlatz… to

cooperate and tell him everything he knows."

**When Developments in the Arbitration Begin to Close in on Bryant, Bryant and
Nudo/Voshel Secretly Orchestrate Two Additional Sham UCC Sales of Proteus Assets to
Aid and Abet Bryant's Breach of Fiduciary Duty, to Conspire to Advance Bryant's Scheme
to Fraudulently Divert Proteus Assets, and to Advance The Scheme by Interfering and
Attempting to Defeat the Plaintiffs' Efforts to Redress Those Actions**

192.    *For Almost Two Years, Bryant/Nudo Concealed from Plaintiffs the Secret and
Unauthorized Transfer of the Proteus Group Business to Ingenious Architecture.* Nudo/Voshel
and Bryant made no disclosure to Plaintiffs that the Ingenious Architecture transaction had ever
occurred.

193.    Nudo/Voshel and Bryant did this to continue Bryant's course of fraudulent

diversion of Proteus Group assets and would constitute a breach of fiduciary and contractual

duties by Bryant as detailed in Plaintiffs December 6 letter to Johnson.

194.    It was not until almost two years later, on or about July 27, 2018, that Plaintiffs

first learned that Bryant had caused the Proteus Group assets to be transferred away to Ingenious

in contravention of the Proteus operating agreements and Bryant's fiduciary duties to Iuppenlatz

and MI Management. Bryant made this disclosure in an Arbitration interrogatory response served on that date when he stated "all assets and liabilities of Proteus Group were assigned to and assumed [by] Ingenious Architecture, LLC." Bryant reiterated this in his responses on October 11, 2018 and February 18, 2019.

***The Factual Context in the Arbitration Prior to the Occurrence of the Two Additional Sham UCC Sales.***

195.    On or about April 11, 2018, Arbitrator Neville entered an order of liability in the Arbitration against Bryant, Proteus Group, and Proteus Holdings in this arbitration based upon specific findings of severe and continuous discovery abuse. Among other things, Arbitrator Neville rejected Bryant's argument that the misconduct was entirely the fault of his counsel and made specific findings of extreme misconduct and dishonesty by Bryant personally.

196.    Thereafter, damages discovery commenced in the Arbitration.

197.    During damages discovery in the Arbitration, Bryant continued to engage in significant discovery abuse, leading to three separate formal findings of violation. Each time, the findings occurred in relation to distinct discovery issues which were the subject of three separate motions to compel, compulsion orders and continued violation. Notably, at the time of these actions, Bryant's previous lawyer had died and could have had nothing to do with the continuing misconduct.

198.    Notably, the violations included a series of false and fraudulent representations and concealments regarding key elements of the Bryant-Nudo/Voshel scheme.

199.    Among other things, when asked in Plaintiffs' 2nd Set of Damages Stage Interrogatory No. 5 to "provide a detailed listing of any and all loans you have given or received,

directly or indirectly, or caused any Bryant business to give or receive"[1] and, for each loan identified, to state in full the type of the loan and identify any collateral involved.

200. Bryant provided a verified response that falsely failed to identify any loans to or from PHDS and omitted other information specifically demanded.

201. Arbitrator Neville granted a motion to compel. In an amended interrogatory response, Bryant listed loans regarding Nudo, NW, and Voshel, but continued to obstruct by stating the types of these loans as "unknown" and identifying the collateral as "unknown."

202. Bryant's deception regarding the loans underlying the Bryant-Nudo/NW/Voshel scheme is also evident through his obstruction and delay and outright failure to produce loan-related information and documents. MI served its first set of interrogatories on May 31, 2018, seeking among other things information about any loans involving Bryant's businesses (Interrogatory 4). Bryant initially stated on July 6, 2018, *inter alia*, that he had loaned $322,119.91 to Proteus Group via NW Loan LLC. He then supplemented his answer on October 11, 2018, claiming he had "no additional information to supplement this answer," *i.e.*, no additional information about such loans.

203. On January 29, 2019, Arbitrator Neville granted Plaintiffs' second damages stage motion to compel, ruling that Plaintiffs were entitled to: (i) "discovery related to punitive damages"; (ii) "broad discovery related to Bryant's financial records, as such records may be the only way to trace transfers of Proteus funds"; (iii) "a complete answer to Interrogatory #2," which sought a comprehensive listing of any businesses owned by Bryant to which Bryant

---

[1] "Bryant business" was defined to include "a company that Bryant created or joined under which he entered into contracts with third parties" and also "any business that was owned, controlled or managed directly or indirectly by Bryant."

caused to Proteus funds or value to be transferred; (iv) "responsive information for the time period January 2009 to present"; and (v) a full response to all interrogatories.

204.    After Arbitrator Neville's January 29, 2019 order granted Claimant's motion to compel on a full response to Plaintiffs' first set of interrogatories, Bryant suddenly found that he in fact had "additional information." In his February 18, 2019 supplemental answer to this interrogatory (Interrogatory 4), Bryant did not provide any additional information regarding the supposed loan of $322,119.91 to Proteus Group via NW Loan LLC. But Bryant supplemented by stating that Proteus Group owes PHDS Acquisition LLC $5,428,120.28, and stated that documents related to the debt were being produced "as Bates Stamps Bryant0001 through Bryant000056." Bryant further that he "has no knowledge of any additional responsive information."

205.    This interrogatory response was false and misleading because, *inter alia*: (i) as alleged in detail above, Bryant definitely had "knowledge of any additional responsive information," including without limitation that the Proteus assets that supposedly collateralized the debt to PHDS had been transferred to Ingenious; (ii) Bryant's 66-page document production was limited to the PHDS transaction executed in April 2015 but did not include the myriad other pertinent documents, *e.g.*, documents related to NW Loan and Voshel.

206.    As to the supposed loan of $322,119.91 to Proteus Group via NW Loan LLC, Plaintiffs November 9, 2018 Second Set of Damages Stage Document Requests sought documents about it. After Bryant failed to produce any responsive documents, Plaintiffs filed another motion to compel, which Arbitrator Neville granted on March 30, 2020: "Respondent shall provide complete production of all documents demanded in Plaintiffs' 2nd Document Requests." Despite this order, Bryant produced no responsive documents.

207.     Bryant further obstructed by falsely claiming no documents exist related to his and Nudo's transfer of Proteus assets to Ingenious. In their First Set of Damages Document Requests, Plaintiffs requested all documents "evidencing the transfer or assignment of any and all assets and liabilities of Proteus Group to Ingenious Architecture, LLC" and "evidencing any and all consideration paid or provided by Ingenious Architecture, LLC in return for the transfer or assignment of any and all assets and liabilities of Proteus Group to Ingenious Architecture, LLC."

208.     Bryant had possession, custody, and control over documents related to the transfer of the Proteus assets to Ingenious. Indeed, as noted above, Bryant filed a lawsuit about this alleged transfer in the Circuit Court of Cook County, settled the case, and then formed BN ICON as a vehicle for obtaining an interest in Ingenious and thus the Proteus assets transferred to Ingenious. Nevertheless, in response to Plaintiffs' request for documents about the asset transfer to Ingenious, Bryant falsely stated: "No such documents exist."

209.     On February 14, 2019, Plaintiffs filed a motion for an order declaring Bryant in violation of Arbitrator Neville's January 29, 2019 order, which had required Bryant to provide discovery responses by February 12, 2019.

210.     On February 20, 2019, Arbitrator Neville granted Plaintiffs' third damages stage motion to compel against Bryant. In his February 20, 2019 order, Arbitrator Neville found: "Throughout the long history of this arbitration, Bryant has failed to produce relevant documents and information in accordance with the orders of the arbitrator, often while asserting his intent to produce such documents after the removal of certain technical or other barriers, ultimately representing that the requested discovery does not exist or is not accessible despite many prior representations by both Mr. Bryant and his former counsel to the contrary."

***Second Sham UCC Sale: July 19, 2019***

211.    Bryant and Nudo took steps to attempt to extract Bryant from the rapidly gathering risk.

212.    Against Proteus' interests and without Plaintiffs' required knowledge and consent, Bryant and Nudo combined in a plan for Voshel to surreptitiously purchase the Proteus assets out from underneath Plaintiffs in a UCC sale. Voshel would hire and pay a lawyer (David Fisher, who had been Inland's counsel on the PHDS transaction) to hold a UCC sale to foreclose upon Voshel's alleged lien against the Proteus Inland Loan and collateral, *i.e.*, the Proteus assets. Bryant agreed to partially fund the legal expense. This would theoretically transfer control over the security interest in the Proteus assets to Voshel.

213.    Bryant and Nudo agreed that the explicit purpose of this foreclosure was to block Plaintiffs' effort recover Proteus assets. In a May 6, 2019 memo to Nudo (and unspecified others ["et al."]), Nudo's employee wrote that that action was "urgent" "due to MI Management coming after Todd Bryant. MI Management is an investor of Proteus."

214.    Both Bryant and Nudo knew and had reason to know at the time that Bryant continued to owe fiduciary duties to Plaintiffs regarding the handling of Proteus assets and knew that conducting this sale would breach of Bryant's fiduciary and contractual duties to Plaintiffs in numerous ways.

215.    Bryant and Nudo caused PHDS to notice for July 19, 2019, a second sham UCC sale – the first having been initially noticed for November 29, 2016 – of PHDS' false and fraudulently obtained security interest in the Proteus Inland Note and collateral, that is, the Proteus assets. In the pre-sale notice published in the Chicago Tribune, the Collateral to be Sold was described as: "assets ('Collateral') in which the Debtor owns or otherwise holds any interest:

(1) certain loans made by Inland Bank and Trust to the Proteus Group LLC, HD Partners Residential LLC and S&S Systems LLC (collectively, the 'Group Debtors') in the total principal amount of $4,750,000 as well as all collateral documents associated with the loans creating the liens on all the assets of the Group Debtors."

216.     Moreover, the representation that the UCC sales would be of Proteus assets was a knowing lie. Bryant and Nudo knew that they had surreptitiously caused the Proteus assets to be transferred to Ingenious Architecture in 2016. The PHDS/Ingenious Complaint leaves no question that nothing was left of Proteus Group after the transfer ("On or about November 1, 2016, Proteus ceased operating" and "became insolvent." (*Id*. at ¶¶ 17, 21.) Later, Bryant repeatedly stated in multiple verified arbitration damages phase interrogatory responses (July 27, 2018, October 11, 2018 and February 18, 2019) that "*all* assets and liabilities of Proteus Group were assigned to and assumed [by] Ingenious Architecture, LLC." (Emphasis supplied.)

217.     Bryant/PHDS and Nudo/Voshel intentionally and recklessly did not provide or cause the provision of notice of the sale to MI or Iuppenlatz, even though they were knew of: (i) MI's perfected security interest in Proteus' assets; (ii) Bryant's fiduciary and contractual duties to Plaintiffs; (iii) their obligation to provide notice of any UCC sale to Plaintiffs; and (iv) the prior promise to notify Plaintiffs of any future UCC sale of the Proteus assets.

218.     In the July 19, 2019 sham UCC sale, Voshel, as a successor to NW and purported secured creditor with respect to the debts, obligations, and liabilities of PHDS, sold the fraudulently obtained security interest for the Proteus Inland Note and collateral.

219.     Voshel "acquired" the Proteus Inland Note and security interest in the Proteus collateral by credit bidding $600,000 at the July 19, 2019 UCC sale. Underscoring that this was a

sham is the fact that both Nudo/Voshel and Bryant well-knew and had represented in court filings that all Proteus collateral had been transferred to Ingenious.

### *Third Sham UCC Sale: September 9, 2019, in Which Voshel Falsely and Fraudulently Attempts to Include The Instant Arbitration as Part of the Proteus Asset Collateral*

220.     On or about September 9, 2019, Nudo/Voshel noticed a third sham UCC sale to occur regarding the non-existent Proteus Assets. This time, the UCC sale involved the sale by Voshel of the security it had "obtained" in the Proteus assets via the July 19, 2019 UCC sale. The total principal amount of that Voshel claimed to be owed allegedly was $8,990,000 (plus interest).

221.     Despite the fact that Nudo/Voshel continued to be well aware of the perfected security interest of MI in the Proteus Group assets and of Bryant's fiduciary and contractual duties to Plaintiffs, Nudo/Voshel intentionally and recklessly did not provide notice of the sale to Plaintiffs. This knowing and intentional concealment was done to facilitate the fraud being committed, Nudo/Voshel's long-term course of fraud and their aiding and abetting Bryant's breach of fiduciary duty.

222.     Voshel credit bid for $1,000,000 for assets that had been sold years earlier.

223.     The transcript of the sham sale includes a critical item of proof evincing additional fraud and powerful proof as to Nudo/Voshel's motive. The transcript described the Proteus Assets being sold as including the "commercial tort claim entitled *MI Management LLC vs. Todd Bryant, et al.*, pending in Chicago, Illinois, as well as all proceeds from therein." In fact, the Bill of Sale for the September 2019 UCC sale states that the Collateral sold includes "the Commercial Tort Claim entitled *MI Management LLC, et al. v. Todd Bryant*."

51

224.    The inclusion of the reference to "the Commercial Tort Claim entitled *MI Management LLC, et al. v. Todd Bryant*" as being part of the collateral sold was groundless, false and fraudulent.

    a. On September 9, 2019, Voshel was selling the security interest in the collateral (Proteus Assets) that Voshel had allegedly purchased from PHDS in the July 19, 2019 UCC sale. This was nothing more than the interest PHDS acquired from Inland at the outset of the scheme.

    b. Voshel could not sell more on September 9, 2019 than it had allegedly obtained on July 19, 2019. PHDS could not sell more on July 19, 2019 than it had obtained from Inland Bank.

    c. To have a security interest in a commercial tort claim, the security agreement must describe it with specificity. A description in a security agreement limited to type of collateral and without describing the commercial tort claim with specificity is legally insufficient to cause a commercial tort claim to be included in the collateral.

    d. The security interests that PHDS purchased from Inland do not include any commercial tort claims. The Commercial Security Agreements (dated 8/1/08 and 1/1/11) contain and document those interests. The agreements do not describe the collateral as including *any* commercial tort claims – even though the derivative commercial tort claim against Bryant was pending as of April 2010, when MI/Iuppenlatz first filed suit against Bryant.

    e. PHDS did not have the capacity to include any commercial tort claims among the security interests it sold on July 19, 2019, and PHDS never referenced or included

in the description of the collateral any commercial tort claims including *MI Management LLC, et al. v. Todd Bryant.* Thus, Voshel cannot even assert misunderstanding.

225.    The motive behind Voshel's sudden inclusion of the false and fraudulent reference to "the Commercial Tort Claim entitled *MI Management LLC, et al. v. Todd Bryant*" as being part of the collateral sold in the September 9, 2019 sham UCC sales was to try to undermine the very arbitration claim Voshel groundlessly purported to include.

226.    To facilitate their scheme even further, Bryant, Nudo, and Voshel concealed the fact of the UCC sales from Plaintiffs for approximately another two years until suddenly presenting it as the arbitration proceedings were winding down to a final damages hearing.

227.    Not only did this violate UCC requirements but the concealment was designed to preclude Plaintiffs from taking other action to address the scheme.

**Nudo/Voshel Intervened in This Arbitration to Advance and Conceal the Scheme to Defraud and to Continues to Aid and Abet Bryant's Breach of Fiduciary Duty by Acting to Defeat Plaintiffs' Ability to Recover.**

228.    After orchestrating the fraudulent structure via that two sham UCC Sales of 2019, Bryant intentionally waited until the final stages of the damages phase of this arbitration before finally disclosing the 2019 UCC sales.

229.    After years of expensive damages discovery fraught by severe obstruction and delay by Bryant, Plaintiffs notified the Arbitrator that Plaintiffs were moving toward the final damages phase hearing and filed a motion highly pertinent to that hearing, to wit, seeking to have all of the well pled allegations deemed admitted for that hearing in light of the finding of liability.

230.    Although Bryant had known of the 2019 UCC sales for two years, only then did Bryant suddenly file a motion to dismiss/motion for summary judgment to dispense with the entire arbitration. Upon information and belief, shortly thereafter, it became apparent to Bryant that his motion may not prevail because Voshel had allegedly acquired the Proteus Group derivative claim and that Bryant may not have standing to advance the theory.

231.    Although the Arbitration is of course an entirely private matter whose details are not of public record, like clockwork Nudo and Voshel materialized from thin air seeking to intervene in this arbitration on April 18, 2022 to bolster this effort by Bryant, asserting that only Voshel held the legal right to advance the derivative claims of Proteus Group because it purported to have purchased these claims in the sham UCC asset sales. Voshel (via Nudo) did so: (i) even though Voshel did not obtain any membership interest in Proteus Group, LLC; and (ii) only LLC members have standing to advance claims on behalf an LLC.

232.    Voshel's intervention in the Arbitration seeks to advance and continue this prior course of misconduct by Nudo/NW/Voshel so as to use a meritless legal position to try to shield Bryant from financial exposure and to conceal Nudo/NW/Voshel's own long-term course of misconduct.

233.    Nudo/Voshel aimed to use its intervention to obtain a ruling giving Voshel the power to dismiss this matter and defeat the ability of Plaintiffs to recover.

234.    That Voshel's intervention was designed to subvert Plaintiffs' efforts to recover Proteus assets is further evidenced Nudo and Voshel's conduct in the Arbitration.

235.    At every turn, Nudo, NW, and Voshel have sought to obstruct and delay, thereby damaging Plaintiffs and increasing Plaintiffs' costs and legal fees by: (i) switching law firms – three lawyers represented Nudo/NW/Voshel in this responding to Plaintiffs' subpoena; (ii)

forcing Plaintiffs to file a motion to compel production of documents; and (iii) to this day, still not completing its document production that was compelled by the subpoena Claimant served on Voshel in late 2021.

**Voshel and NW are Nudo's Alter Egos and/or Nominees.**

236.    At all times pertinent to this matter, actions by Nudo were actions attributable to Voshel and NW.

237.    Through ownership and as a practical matter, Nudo completely and exclusively dominates and controls NW and Voshel to the point that they have no legal or independent significance of their own. Nudo and Voshel operate as a single economic entity and as a façade for Nudo; Nudo and Voshel operate as a single economic entity and as a façade for Nudo.

238.    Nudo operates NW and Voshel and his various other businesses out of the same office for his company Marc Realty. Upon information and belief, Nudo maintains Voshel-related and NW-related documents on the same Marc Realty server that he uses for his various other businesses and for personal matters. He uses the same email address for Voshel, NW, and his various other businesses, and for personal matters: gnudo@marcrealty.com.

239.    Nudo employs the same Marc Realty employees and the same lawyers to represent his interests, those of Voshel and NW, and of his various other business. Marc Realty employees participated in and facilitated various of the actions and conduct alleged in this Complaint on behalf of Nudo. For example, through the relevant time period, various Marc Realty employees were involved in administering and addressing Proteus loan issues, making payments for on behalf of Voshel related to Proteus, and communicating with Bryant and his agents regarding Proteus matters,

240.    Upon information and belief, NW and Voshel do not have their own employees. None of the large volume of documents Voshel and NW have produced in the arbitration are sent or received by or reference Voshel or NW employees. Nudo is Voshel's sole manager. Nudo is a manager of NW (along with another principal of Marc Realty).

241.    Upon information and belief, Voshel and NW have not observed corporate formalities. Voshel and NW have not produced any corporate minutes, resolutions, or other documents evidencing corporate formalities.

242.    Voshel, NW, and Nudo commingle their interests, including assets and liabilities. For example, Bryant debts to Voshel and Nudo's wife, Anne Voshel, are identified as "due to Jerry Nudo" in a spreadsheet Nudo/Voshel has produced in response to Plaintiffs' arbitration subpoena. As another example, although Voshel supposedly acquired Proteus' assets in the third sham UCC sale, in an email regarding the status of Proteus, Bryant has described Nudo (not Voshel) as owning the assets of the company.

243.    In the Arbitration, even though the Plaintiffs' subpoena was directed to Voshel, Voshel's counsel has stated that it has produced its documents on behalf of Voshel and Nudo. Furthermore, in response to the subpoena to Voshel, NW made its own production.

244.    Nudo has used the corporate structure of NW and Voshel to cause a fraud or similar injustice. Upon information and belief, Nudo has operated his businesses through NW and Voshel to insulate himself from creditors and to perpetrate a fraud, conspire to commit fraud and breaches of fiduciary duty, aid and abet fraud and breaches of fiduciary duty.

## COUNT I
## AIDING AND ABETTING BRYANT OR CONSPIRING WITH BRYANT TO BREACH HIS FIDUCIARY DUTIES TO PLAINTIFFS
### (Against All Defendants)

245.    Plaintiffs reallege herein the allegations set forth above.

56

246. Bryant owed and continues to owe fiduciary duties to Plaintiffs. In its putative Intervention Arbitration Demand, Voshel (with Nudo's approval) alleges and thus admits that Bryant owed and continues to owe fiduciary duties to Plaintiffs.

247. Bryant breached his fiduciary duties to Plaintiffs in the myriad ways alleged in Plaintiffs' SADA and above. In its Intervention Arbitration Demand, Voshel (with Nudo's approval) alleges and thus admits that Bryant breached his fiduciary duties to Plaintiffs.

248. As alleged above, Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty: (i) knew and had reason know that Bryant owed fiduciary duties to Proteus, including without limitation by virtue of the fact that Bryant was a Proteus member and/or manager and controlled Proteus and that Bryant sought to avoid liability and financial exposure to another member/manager, *i.e.*, Plaintiffs; (ii) knowingly and recklessly participated in Bryant's breaches of fiduciary duty in the myriad ways described above; and (iii) had actual and constructive knowledge (*i.e.*, recklessness) that Bryant was breaching his duties to Plaintiffs and that Nudo/NW/Voshel's conduct was legally improper.

249. Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, engaged in a long-term course of deception, fraud, and aiding and abetting of Bryant's breaches of fiduciary duty as described above, including: (1) PHDS's improper, concealed purchase of the Proteus Inland loan structured to provide Nudo/NW/Voshel control over the Proteus Group assets in derogation of the rights of Plaintiffs; (2) the failure to properly account for other proceeds underlying the alleged NW/Voshel loan balances designed to ensure that the "Proteus Group" assets remained encumbered; (3) the secret improper transfer of the entire Proteus Group operation to Ingenious Architecture without disclosure to or approval by Plaintiffs, leaving an insolvent shell; (4) the attempt to conduct the first sham UCC Sale of Proteus Group assets in

December 2016-January 2017, first attempting to conceal the sale completely from Plaintiffs and then engaging in misrepresentation and/or omission of material facts to Plaintiffs regarding the purported faux UCC sale; (5) the second sham UCC sale of non-existent Proteus Group assets on July 19, 2019; (6) the third sham UCC sale of non-existent Proteus Group assets on September 9, 2019 this time adding without basis the inclusion of Plaintiffs' derivative claim; (7) Voshel's intervention in the arbitration nearly two years after the faux 2019 UCC sales designed to obstruct and defeat Plaintiffs' effort to pursue Proteus assets that Bryant diverted from Proteus through 2013, that Bryant and Nudo diverted to Ingenious and to other non-Proteus recipients from 2013 and thereafter; and (8) Voshel's course of obstructive conduct in the arbitration, which (i) forced Plaintiffs to file a motion to compel, and (ii) even after the motion was granted, Voshel still has not completed its production.

250.    As a result of the concerted actions of Bryant and Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, Plaintiffs have been damaged.

## COUNT II
## CONSPIRACY TO DEFRAUD
### (Against All Defendants)

251.    Plaintiffs reallege herein the allegations set forth above.

252.    As alleged in detail above, Bryant and Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, engaged in a conspiracy to defraud Plaintiffs by knowingly, intentionally and recklessly employing and agreeing to employ material misrepresentations, material omissions, and deceptive activity, including without limitation: (a) advancing, continuing, and concealing the Bryant Misconduct; (b) fraudulently transferring and siphoning assets from Proteus for the benefit of Bryant and Nudo/NW/Voshel, including to PHDS, Ingenious Architecture, Voshel, NW and or any other successor of Proteus; (c) hiding the first

sham UCC sale from Plaintiffs; (d) after Plaintiffs discovered the first sham UCC sale, affirmatively representing that there were Proteus assets to sell when in fact that Proteus assets previously had been transferred to Ingenious; (e) failing to disclose the transfer of Proteus assets to Ingenious; (f) the second sham UCC sale of non-existent Proteus Group assets on July 19, 2019; (g) the third sham UCC sale of non-existent Proteus Group assets on September 9, 2019 this time adding without basis the inclusion of Plaintiffs' derivative claim; (h) Bryant false and fraudulent discovery responses in this arbitration regarding the PHDS transaction, the Ingenious transfer, and Nudo-related loans; (i) Voshel's intervention in this arbitration nearly two years after the faux 2019 UCC sales designed to obstruct and defeat Plaintiffs' effort to pursue Proteus assets; and (j) Voshel's course of obstructive conduct in this arbitration.

253.    Bryant and Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, engaged in myriad conduct and overt acts and omissions calculated to deceive Plaintiffs, including without limitation the concealments, misrepresentations, improper and fraudulent transfers, and wrongful inducements described in detail above.

254.    Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, knew and had reason to know, approved, and benefitted from the frauds and breaches that Bryant had committed against Plaintiffs before Voshel/Nudo engaged in concerted action with and aided and abetted Bryant.

255.    Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, knowingly and recklessly accepted the fruits of the above-described fraud with actual knowledge of the fraud and/or willful ignorance of the fraud, including without limitation an ownership interest in Ingenious (through BN ICON) and/or distributions, payments, and other transfers from Ingenious.

256. As a result of Bryant's and Nudo/NW/Voshel's (with the knowledge and assistance of and via Marc Realty) conduct, Plaintiffs were damaged.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against All Defendants)

257. Plaintiffs reallege herein the allegations set forth above.

258. Plaintiffs and Bryant entered into a valid and enforceable contract – *i.e.*, the Proteus Holdings operating agreement. Voshel's Intervention Demand (approved by Nudo) admits that this is a valid and enforceable contract.

259. Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, knew and had reason to know of: (i) the Proteus Holdings operating agreement; and/or (ii) Plaintiffs' contractual rights related to Proteus Group as a result of the Proteus Holdings operating agreement.

260. As alleged in detail above, Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, intentionally and unjustifiably induced Bryant to breach the contract by aiding and abetting and conspiring with Bryant to undermine Plaintiffs' ability to exercise their contractual rights under the Proteus Holdings operating agreement, including without limitation: (a) engaging in the various transactions alleged above on behalf of Proteus without Plaintiffs' knowledge and despite their contractual right to approve such transactions; (b) transferring Proteus assets without Plaintiffs' knowledge and despite their contractual right to approve such transactions; (c) engaging in supposed UCC Sales of Proteus assets in an attempt to defeat Plaintiffs' contractual rights; (d) subverting Plaintiffs' contractual right to seek and obtain redress from Bryant directly and derivatively via arbitration for Bryant's breaches as alleged in the SADA and Voshel's Intervention Demand and in this Complaint.

261.     Bryant breached the Proteus Holdings operating agreement by, *inter alia*, engaging in the conduct described in the preceding paragraph (and other breaches alleged throughout this Counterclaim).

262.     Plaintiffs have suffered damages as a result of Bryant's breaches of the Proteus Holdings operating agreement.

## COUNT IV
## AIDING AND ABETTING, CONSPIRING TO COMMIT, AND PARTICIPATING IN FRAUDULENT TRANSFERS
### (Against All Defendants)

263.     Plaintiffs reallege herein the allegations set forth above.

264.     Bryant directly and through entities under his control such as PHDS made and caused to be made the numerous transfers of Proteus assets enumerated above with actual intent to hinder, delay, or defraud his creditors, including MI Management and Iuppenlatz. These transfers include without limitation the transfer of Proteus assets: (i) to PHDS/Bryant; (ii) from PHDS/Bryant to Ingenious; and, (c) to the extent that Voshel argues that Proteus assets were not transferred to Ingenious, from PHDS/Bryant to Voshel (via faux UCC sales).

265.     Nudo/NW/Voshel, with the knowledge and assistance of and via Marc Realty, conspired and participated with and aided and abetted Bryant and entities under Bryant's control such as PHDS in the fraud scheme described in detail above and in making the aforementioned transfers.

266.     The numerous transfers of funds enumerated above were made with actual intent to hinder, delay, or defraud because, *inter alia*:

　　　a.   The transfers were to insiders – *e.g.*, from Proteus (under Bryant's control) to Bryant/PHDS, from Bryant/PHDS to Ingenious, *etc.*;

b. Bryant retained possession or control of the Proteus assets transferred to PHDS, Ingenious, and Voshel (to the extent that Nudo/NW argue that Proteus assets were not transferred to Ingenious). As alleged above, every transfer of assets clearly occurred at Bryant's direction and with his full knowledge and participation.

c. The transfers were undisclosed and concealed. As alleged in detail above, Bryant (directly and through his representatives) repeatedly has made or caused to be made false statements or material misrepresentations or material omissions with regard to his control over and the transfers of the Proteus assets. Moreover, in the arbitration and continuing to date, Bryant and Nudo/Voshel have made every effort to conceal and obstruct Plaintiffs from obtaining information and discovery regarding the transfers.

d. Bryant had been sued or threatened with suit before the transfers were made, including MI Management lawsuit related to the MI Note, the prior arbitration, and the instant arbitration. Nudo/NW/Voshel/Marc Realty were aware of the foregoing litigation and conspired and aided and abetted Bryant in his scheme to undermine Plaintiffs' efforts to obtain recovery from Bryant in this arbitration.

e. As alleged in detail above, with Nudo/NW/Voshel/Marc Realty's knowledge, consent, and extensive and direct assistance, Bryant removed or concealed Proteus assets.

f. The transfers were not for reasonably equivalent value. For example, the PHDS/Bryant transfer of the Proteus assets to Ingenious involved the transfer of a going concern (Proteus) in exchange for the assumption of debt of much lesser value than the Proteus assets.

g. The transfers occurred shortly before and/or shortly after Bryant incurred a substantial debt. Bryant's transfers occurred shortly before and/or shortly after Bryant became a judgment debtor of MI Management (and other creditors).

267. As a direct and proximate result and by reason of Nudo/NW/Voshel/Marc Realty's participation in, aiding and abetting, and conspiracy to commit the fraudulent transfers set out in this Complaint, Plaintiffs have been injured.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs MI Management, LLC and Mark Iuppenlatz respectfully request that this Court enter a judgment granting Plaintiffs the following relief against Defendants:

A. An award of damages against Defendants in an amount to be proven at the arbitration hearing;

B. An award of punitive damages against Defendants;

C. Imposition of a constructive trust on any: (i) Proteus assets over which Nudo, NW, and/or Voshel have possession, custody, or control; or (ii) direct or indirect interest of Nudo, NW, and/or Voshel in Proteus assets (*e.g.*, through BN ICON);

D. A finding that Voshel and/or NW are alter egos and/or nominees of Nudo;

E. Awarding Plaintiffs all reasonable attorneys' fees and costs incurred by Plaintiffs in prosecuting this matter; and

F. Awarding Plaintiffs all other relief as is just and proper.

**GREENBERG TRAURIG, LLP**

Dated: September 8, 2023

By: *s/ Scott Mendeloff*
Scott Mendeloff
Gabriel Aizenberg
Greenberg Traurig, LLP
77 W. Wacker, Suite 3100
Chicago, IL 60601

Telephone: 312-456-1083
mendeloffs@gtlaw.com
aizenbergg@gtlaw.com
*Attorneys for Plaintiffs*